McGEE, Chief Judge.
Juan Carlos Ruiz ("Ruiz") was shot in the head and killed as he was driving a white Ford Focus (the "Ford") eastbound on Holloway Street/Highway 98 ("Holloway") in Durham, at approximately 4:25 p.m. on 25 May 2014. Alexis Hernandez Ramirez ("Defendant") was charged and convicted of the first-degree murder of Ruiz and of discharging a firearm into an occupied vehicle in operation. Defendant argues on appeal that the trial court committed prejudicial error by instructing the jury on "flight." We find no error.
I. Facts
Defendant's girlfriend at the time of the murder was fifteen-year-old Yadira Mendez ("Mendez"). Defendant was twenty-one at the time of the shooting. At Defendant's trial, Mendez testified to the following: She was in the front passenger seat of Defendant's stepfather's dark green or blue car ("Defendant's car") as Defendant was driving her and his brother to pick up a friend on the afternoon of 25 May 2014. Mendez testified Defendant always wore a hat, and she identified a gray Lakers baseball cap as one of the hats Defendant owned. As Defendant was heading west on Holloway, a four-lane road, he made an unexpected U-turn and
started driving really fast and he was excited until he got close up to-he got close to another car [the Ford], he passed [the Ford] a little bit, and then he slowed down to get right beside [the Ford]. And that's when he pulled-pulled out his gun from his pants and he started shooting.
Mendez testified that the Ford was traveling in the left lane, and that Defendant's car was in the right lane as he pulled up beside the Ford. Mendez testified that Defendant had his left hand on the steering wheel as he pointed the gun at the Ford through his open window with his right hand, and that Defendant fired three shots. Mendez also testified: "I saw a guy's head just go down and [the Ford] just started driving off and crashed." "[Defendant] started driving really fast and was just saying, 'I shot an OG. I shot an OG.' "
When Durham Police Investigator Ann Cristaldi ("Investigator Cristaldi") arrived at the scene where the Ford had crashed, she recognized one of Ruiz's tattoos, which said "Scooby." She recognized that name as belonging to someone she knew from a previous investigation and that he belonged to the "Norteno" or "Northside" gang. When Investigator Cristaldi requested an identification for a gang affiliate with the nickname "Scooby," it came back as Defendant's known nickname. Ruiz's girlfriend, Katie Crowder ("Crowder"), testified that she knew Ruiz "was, you know, supposed to be an OG or something[,]" but that he "didn't want to be around it [anymore]." Crowder testified that she understood "OG" to mean "Original Gangster."
Immediately after the shooting, Defendant drove to his house, which was not far from where the shooting occurred. Mendez remained in Defendant's car while Defendant went into the house with the gun he had used to shoot Ruiz, and returned with a different handgun. She described the gun Defendant used to shoot Ruiz as looking "like a police gun," and the gun Defendant retrieved from his house as "like, one of those old ones, like a revolver-type." Mendez was interviewed at the police station on 3 June 2014 concerning the shooting, and her statement, which she read at trial, largely conformed to her trial testimony.
A video camera from a tobacco shop on Holloway captured what Mendez identified as the shooting, as well as the moments preceding and following it. Mendez identified two cars depicted on the video and in the photographs as the Ford and Defendant's car. According to Mendez's testimony as she watched the video, it accurately depicted the events as she had described them in her earlier testimony. Mendez identified the part of the video that she said depicted the moment Defendant shot Ruiz, stating she "saw [Ruiz's] head just [go] down and the [Ford] drifted away." According to Mendez, the Ford continued to drift over and off the street until it "crashed into a house." Defendant then sped away. At some point in the video, a red truck passed in front of the tobacco shop. Mendez testified that the red truck was not involved in the shooting, and that at some point, she "actually met the people that were in the red truck" and they had no involvement in Ruiz's death.
Investigator Cristaldi received a tip from a man calling himself "Little David," indicating that Defendant and "a female [who] went to Southern High School with a first name of Yadira" were involved in the shooting. Investigator Cristaldi testified that, in support of his claim, Little David "showed us some Facebook photos." Mendez was questioned at the police station on 3 June 2014. When asked why she thought the police wanted to question her, Mendez testified that the officers "said that people did see me in [Defendant's car]. And I had also told somebody and I guess that somebody told [an officer]." Mendez was asked: "Did you tell other people in other forms of media?" Mendez replied: "Yes." She said she had engaged in an exchange on Facebook with Ruiz's sister and Crowder. Mendez identified a document that was presented to her as being a copy of her Facebook exchanges. In one of Mendez's Facebook comments, she said "it was [Defendant who shot Ruiz] and that [she] didn't care what happened." On cross-examination, Mendez agreed with Defendant's counsel's statement that in her interview with police, she was "bragging about it on Facebook[.]" Following her interview at the police station, Mendez signed a written statement, which she read at trial. Mendez's statement closely conformed to her trial testimony. Part of her statement was that "[a]fter [Defendant] saw that he shot Scooby, the [Ford] drifted. [Defendant] drove [away] fast and we went to his house. When we were there, he was screaming, 'Hell, yeah, I shot an OG.' "[1]
Mendez testified she corresponded with Defendant for a short period subsequent to his arrest while he was in jail. Some of those letters were read in court, and mainly consisted of Defendant expressing his devotion to Mendez in what could be interpreted as a manipulative manner, and then asking her to withdraw her statement to the police identifying him as the shooter. Defendant also repeatedly asked Mendez to go live with his brother, and to stay away from her parents. Some examples of Defendant's entreaties follow: "Please, I ask you on my knees that you say that you don't know anything, that you were only lying. I beg and plead with you, please, be quiet. Only ... say that if they ask you. Okay?" "And always tell them that you don't know anything, that everything is a lie, that you were only angry at me, and you want your attorney and don't speak with anybody." Defendant instructed Mendez to "[g]o to live with my brother, but don't tell anybody where you're going to live, baby, please." Defendant told Mendez, "[w]hen you go over there [to his brother's house], erase from Facebook-close up, erase your Facebook, please, my love." "Do this great favor for me, baby. I already spoke to him [Defendant's brother]. .... I beg you, go with him and don't tell anybody anything, please. My love, do what I'm asking you to do." Defendant told Mendez that she should try to convince her parents to support him because otherwise-for reasons unclear-they would end up spending twenty years in jail "for kicking [Mendez] out of their home[.]" "So tell [your parents] that everything is a lie, what you have told them about me. Baby, please talk to them. And when all this is over, we will be together again, I promise you."
Defendant asked Mendez to deny having been his girlfriend: "Always remember that if-if they ask you if you and I are boyfriend and girlfriend, tell them no. Okay? Because they're going to want to give me 20 years in jail if you say that I had sex with you." "Please do what I tell-what I'm asking you to do. Don't take this as a game because my life is in play here, my love." Finally, Defendant instructed Mendez:
"And I want you to say that you were lying about what you had said and that you're a minor and that you did not know what you were saying and that you want your lawyer. Because you know that it is a lie, all of this. Okay? But always remember what you are saying. Don't ever make a mistake. Okay? And don't come see me."
Ruiz's brother, Andy Cantu ("Andy"), was sitting in the front passenger seat of the Ford when Ruiz was shot in the head. Another brother of Ruiz, Adam Cantu ("Adam") and Adam's friend Jose Gonzalez ("Gonzalez") were riding in the back seat of the Ford. Andy's testimony corroborated the general series of events leading to Ruiz's murder as testified to by Mendez. Andy testified that a "greenish-blue" car
dashed right out ahead of us and then just reduced speed and then just constant, like, leveled out with us and kept going with us like that, I guess to kind of see who was in [our] car. And then after he saw who it was, I guess that's when he just started shooting.
Andy elaborated:
So while we got off on [Holloway], we were just going down the road and then just having a conversation, just laughing, doing-just being silly. And then, well, we see-I hear [the greenish-blue] car and I turn around because it catches my eye that it floors-it floors the gas and then it lets up right when it's beside our car and kind of, like, looking into our car, like, trying to see who was in there.
And by the time, I guess, he-he identified who it was, that's when he pulls out his gun and starts firing at us and then takes off, right after he saw that we swerved off.
Andy testified that he never saw a red truck. He further testified that, while the greenish-blue car was parallel with the Ford, he "just s[aw] this guy looking into our car and then kind of raising his right hand over his shoulder and pointing the gun, pointing the gun at us."
On the same day as the shooting, Andy identified the driver of the greenish-blue car to the police as "a Hispanic male" and also told the police that "a Hispanic female" was in the greenish-blue car. Andy testified that he thought "well, he's going to shoot, so that's when I-I just-I covered myself." One shot had already been fired when Andy "covered" himself, and he remembered hearing "about four shots" within "a matter of seconds[.]" Andy testified that he knew Ruiz was dead because there was a "hole in the back of his head and the blood was everywhere[.]" Once Ruiz was shot, the Ford "swerved off and we [went] in between a house and a tree and we hit directly into the foundation of a house."
Just before taking cover, Andy saw that the man with the gun was wearing "a gray Lakers hat" and firing a "black gun" which he thought might be a Glock. Andy stated that the Lakers hat stuck in his mind because "not too [many] people wear Lakers hats[,]" and that he had not seen "that particular style" before. Andy identified "State's Exhibit Number 7" as a "gray Lakers hat." Andy testified he believed it to be the same gray Lakers hat worn by the shooter because it had an "emblem on the side" that was "the perfect picture of" an emblem he remembered seeing on the gray Lakers hat worn by the shooter. Investigator Cristaldi testified that, when she questioned Andy at the scene at about 8:36 p.m., Andy stated the Ford drove onto Holloway, then
a blue Acura pulled alongside, they started firing. He said it was a Hispanic male, he didn't see the face. He heard four shots. They swerved and hit the house. He ducked down. He said the suspect vehicle, there was a guy and a girl and possibly an Acura. And then he gave us some-he gave us some information on [ ] Ruiz's history, his gang affiliation and whatnot.
Andy was shown the same video and video stills that Mendez had been shown, and his testimony as to the sequence of events as related to the photographs generally corroborated Mendez's testimony.
Durham Police Officer Brandon Parrott ("Officer Parrott") testified that he was the coordinator for the Crime Stoppers program at the Durham Police Department on 27 May 2014, when he received an anonymous tip concerning Ruiz's murder. Officer Parrott testified that the caller stated that two cars were involved in the incident, "a white car and a[n olive] green car[.]" The tip generally corroborated the testimonies of Mendez and Andy concerning the series of events culminating in the driver of the "green car" pulling beside the "white car and an arm came out of the driver's side window of the green car and fired an unknown number of shots" at the "white car," whereupon the "white car" "ran off the road and hit a house," and the "green car" drove away.
Investigator Cristaldi testified that when they interviewed Gonzalez after the shooting, Gonzalez stated he was sitting behind Ruiz in the Ford when Ruiz was shot. He stated that "a male started shooting. He saw a faded green-colored car with a female in the passenger's seat. He described the male as being mixed origin, maybe Puerto Rican and Mexican, but not black. When the shooting started, [ ] Ruiz slumped forward and they crashed into the house."
Crowder testified that, in a 5 June 2014 Facebook message exchange, Mendez confessed that "she was right next to [Defendant] when he shot Scooby and that she saw him." Crowder read the actual exchange she had with Mendez concerning the shooting and, in that exchange, Mendez wrote: " 'I was right beside [Defendant] when [Defendant] shot [Ruiz] and I don't feel sorry or anything. I don't give a f-ck [Ruiz] died in my face. So what, [Ruiz is] dead; ain't sh-t to me.' " In another part of the 5 June 2014 Facebook exchange, Mendez stated: " 'I know what [Defendant] did was f---d up, but what else y'all want-[Defendant's] in for life. What else do you want?' " This exchange occurred two days after Mendez's 3 June 2014 statement to the investigators.
Defendant was indicted on 7 July 2014, and convicted on 6 October 2016 of first-degree murder and discharging a firearm into an occupied vehicle in operation. He was sentenced to life without the possibility of parole. Defendant appeals.
II. Analysis
In Defendant's sole argument, he contends the trial court "erred or committed plain error by instructing the jury on flight when there was no evidence that [ ] Defendant took steps to avoid apprehension." We disagree.
Our Supreme Court clearly sets forth the law concerning plain error:
Because defendant did not object to the instruction as given at trial, we consider whether this instruction constitutes plain error.
The plain error standard requires a defendant to "demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " "[P]lain error is to be 'applied cautiously and only in the exceptional case' " in which a defendant can show that the prejudicial error is "one that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " For plain error to be found, it must be probable, not just possible, that absent the instructional error the jury would have returned a different verdict.
State v. Juarez , 369 N.C. 351, 357-58, 794 S.E.2d 293, 299-300 (2016) (citations omitted).
Assuming, arguendo , the trial court erred by instructing the jury on flight, Defendant cannot demonstrate prejudicial error, much less plain error, on the facts before us. " '[F]light from a crime shortly after its commission is admissible as evidence of guilt[,] ... [s]o long as there is some evidence in the record reasonably supporting the theory that defendant fled after the commission of the crime charged[.]' " State v. Abraham , 338 N.C. 315, 361, 451 S.E.2d 131, 156 (1994) (citations omitted). Defendant argues that the allegedly erroneous instruction on flight rises to the level of plain error because (1) there was no physical evidence tying Defendant to the crime; (2) Mendez was the only person who testified who directly identified Defendant as the shooter; (3) Mendez had reasons to give false testimony; and (4) the police never located or investigated the red truck that was seen on the video and identified by one witness as a possible suspect vehicle.
However, multiple witnesses repeatedly and consistently testified that a blue or green car-not a red truck-pulled up beside the Ford and that the driver of that car fired multiple shots into the Ford, killing Ruiz and causing the Ford to drift off Holloway Street and crash into a house. One of these witnesses, Mendez, identified the shooter as Defendant and testified that she was riding in the car with Defendant at the time. Ruiz's brother Andy, and Gonzalez, who were passengers in the Ford, observed a green or blue vehicle pull up beside the Ford, saw "a Hispanic female" in the front passenger seat and saw "a Hispanic male," who was driving, aim a black handgun at the Ford and start shooting. The evidence concerning the automobiles involved, and the manner in which the vehicle identified as Defendant's car approached the Ford so that Defendant could shoot Ruiz, was corroborated by the video captured by the camera on the tobacco shop. Overwhelming evidence presented at trial identified the vehicle from which the shots were fired as a car-either blue or green in color-and being driven by the shooter, "a Hispanic male," with "a Hispanic female" in the front passenger seat.
Defendant's argument that the jury could have believed the shooting was perpetrated by someone in the red truck is simply not persuasive. The evidence was overwhelming that Ruiz was killed by "a Hispanic male" driving a blue or green car, and the moments immediately before and after the shooting, as well as the moment of the shooting itself, were captured on the tobacco shop video. Therefore, the main question for the jury to decide was whether the State met its burden of proof in establishing that it was Defendant, and not some other person, who was driving the blue or green car from which Ruiz was shot. If the jury was convinced by the evidence that it was Defendant who was driving that car, it hardly mattered whether Defendant's departure from the scene constituted flight, as his guilt would already have been firmly established in the minds of the jurors at the time of the shooting. If the jury did not believe Defendant was driving the car from which the gunshots were fired, they also would not have believed Defendant was driving that same car as it left the scene of the shooting. Therefore, whether that car left the scene in a manner that could have constituted "flight" would have been irrelevant and the jury would have acquitted Defendant. Defendant fails to prove "a reasonable possibility that, had the [alleged] error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2017). Having failed to prove prejudicial error pursuant to N.C.G.S. § 15A-1443(a), Defendant also fails to meet the much higher burden of proving plain error.
NO ERROR.
Report per Rule 30(e).
Judges DAVIS and TYSON concur.

Mendez later testified that she did not know Ruiz, so it is unclear how she came to know he went by the nickname "Scooby."